```
                                                            U.S. DISTRICT COURT
                                                            DISTRICT OF VERMONT
                                                                    FILED
              UNITED STATES DISTRICT COURT
                         FOR THE                             2025 AUG 11  PM 4:35
                    DISTRICT OF VERMONT
                                                                  CLERK
                                                            BY_____
                                                                 DEPUTY CLERK
```

| | |
|---|---|
| BIDDEFORD INTERNET ) | |
| CORPORATION d/b/a ) | |
| GREAT WORKS INTERNET and GWI ) | |
| VERMONT, LLC ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:25-cv-00354 |
| ) | |
| F.X. FLINN and EAST CENTRAL ) | |
| VERMONT TELECOMMUNICATIONS ) | |
| DISTRICT, ) | |
|     Defendants, ) | |
| ) | |
| F.X. FLINN and EAST CENTRAL ) | |
| VERMONT TELECOMMUNICATIONS ) | |
| DISTRICT, ) | |
|     Counter Claimants, ) | |
| ) | |
| v. ) | |
| ) | |
| BIDDEFORD INTERNET ) | |
| CORPORATION d/b/a ) | |
| GREAT WORKS INTERNET and GWI ) | |
| VERMONT, LLC ) | |
|     Counter Defendants. ) | |

### ORDER GRANTING EAST CENTRAL VERMONT TELECOMMUNICATIONS DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION
(Doc. 28)

Defendant and Counter Claimant East Central Vermont Telecommunications District ("District) moved for a preliminary injunction on June 20, 2025, seeking to compel Biddeford Internet Corporation d/b/a Great Works Internet and GWI Vermont, LLC (collectively "GWI") to: (1) comply with the proposed "Transition Policy"; (2) provide access to the communications plant and all components at issue; and (3) cease further efforts to frustrate the transition between GWI

and the successor operator of its internet service provider business. (Doc. 28). Defendant F.X. Flinn is not a party to the motion. GWI opposes this motion. (Doc. 31.)

The District is represented by Ryan M. Long, Esq. GWI is represented by Harvey J. Wolkoff, Esq., and Evan J. O'Brien, Esq.

## *Findings of Fact*

The District is Vermont's first communications union district, established in 2015. The District provides internet service to just under 10,000 customers and just over 10,000 locations in east central Vermont, including to individuals, schools, libraries, and apartment buildings. ECFiber is the trade name of the internet service provider business owned by the District. ECFiber does not have any employees. GWI currently operates ECFiber. ECFiber provides an important service to customers living in rural areas of Vermont. Many of these customers rely on the services provided by ECFiber for access to the internet, and those in the most remote areas with no cell service would be required to revert to "dial up" to access the internet without ECFiber's services. (Tr. 55:8–15, July 29, 2025.)

ValleyNet, Inc. was the original operator of ECFiber by virtue of an Agreement ("Operating Agreement") executed between ValleyNet, Inc. and the District. (Ex. A.) The term of the Operating Agreement began on February 22, 2016 and expires on December 31, 2025. GWI, with the consent of the District, became the official operator of ECFiber on January 1, 2023 after entering into an Assignment and Assumption Agreement with ValleyNet, Inc. (Ex. I.) GWI, had been assisting in the operation of ECFiber since May 2022. (Tr. 30:10–12, July 29, 2025.) When GWI and ValleyNet, Inc. entered into their agreement, GWI assumed all the rights and obligations previously held by ValleyNet contained in the Operating Agreement. (Ex. A.) As a result, the contractual relationship between the District and GWI is controlled by the Operating Agreement.

As the end-date of the Operating Agreement approached, and the parties began to discuss the terms for a new Operating Agreement, several disagreements arose between the District and GWI. On April 8, 2025, the Governing Board of the District voted to discontinue negotiations with GWI and "move ahead with a memorandum of understanding with the Vermont ISP Operating Company, a/k/a/ VISPO, to act as [the District's] future operator and negotiate the transition with GWI." (Tr. 37:24–25, 38:2–9, July 29, 2025.)

VISPO is a newly-formed entity. As of July 29, 2025, VISPO had a board of directors and one employee. The one employee is a Chief Executive Officer whom VISPO hired on June 26, 2025. As of July 29, 2025, VISPO was attempting to fill no fewer than thirty-nine positions, including a chief engineering officer and positions in customer service, networking, technical services, engineering, administration, and finance. (Ex. 10.)

In a letter dated April 16, 2025, the District advised GWI that VISPO would succeed them as the operator of ECFiber. (Ex. K.) At the request of GWI, the District gave GWI permission to share "ECFiber's data and system access and credentials with VISPO representatives in order to facilitate the transition process." (*Id.*) In an email on the same date, GWI acknowledged receipt of this letter, but cancelled a meeting between the District and GWI that had been scheduled for the next day. (Ex. M.) Continued efforts to facilitate the transition between VISPO and GWI have been unsuccessful.

On May 6, 2025, the District sent a Transition Policy to GWI. (Ex. O; Ex. Q.) In this letter, F.X. Flinn, as the District's Governing Board Chair, indicated the Transition Policy:

> provides direction on winding up operations. GWI is directed to work directly with our new operator the Vermont ISP Operating Company ("VISPO") to develop a detailed supplemental transition plan pursuant to the Transition Policy. The schedule in the Transition Policy may be modified by mutual agreement between GWI and VISPO in the supplemental transition plan. However, unless that schedule is modified, the District considers that schedule in the Transition Policy

3

to be the operative schedule, deviation from which will irreparably harm the District, its members, its customers, and its respective Operators.

(Ex. O.)

The Transition Policy was discussed at the May 13, 2025 meeting of the District's Governing Board. (Ex. P.) Alex Rozek, owner of GWI through his company Mac Mountain, was present at this meeting, as was Attorney Evan O'Brien who represents GWI. (*Id.*) Mr. Rozek provided public comment regarding his concerns about the transition to VISPO. (*Id.*) He did not, however, provide any comment regarding the terms of the Transition Policy. (*Id.*; Tr. 46:10–12, July 29, 2025.) The Governing Board adopted the Transition Policy by a unanimous vote. (Ex. P.)

Since the adoption of the Transition Policy, GWI has resisted efforts by the newly appointed Clerk of the Works to enter the GWI office space, telling the Clerk of the Works that employees would work remotely if he came into the office space. (Tr. 129:20–25, July 29, 2025.) This was stated, even though ECFiber pays the lease for this office space. (Tr. 89:13–15, July 29, 2025.)

A dispute has also arisen over GWI's attempt to change the provider of its back-office operating system. The current system is known as Vision. This system integrates with outside billing systems, organizes workflow as it relates to installing services to new customers and making repairs to existing customers, and integrates with GIS systems (geographical information systems), which are maps of the fiber network. (Tr. 86:11–24, July 29, 2025.) GWI would like to transition to Gaiia, believing it to be more secure and less expensive. The cost of the contract for Gaiia exceeds $50,000. (Tr. 141:25, 142:1–4, July 29, 2025.)

Thomas Cecere, who is the general manager of GWI, has attended many meetings of the District's Governing Board in the past. He neither attended the meeting where the Transition

4

Policy was discussed nor any Governing Board meetings since the Transition Policy was adopted. Furthermore, Mr. Cecere has not proposed any alternatives to the Transition Policy adopted by the District, nor advised the District of the cost of the proposed transition plan. (Tr. 139:11–20, July 29, 2025.)

GWI has received estimates from two consultants as to the costs associated with transitioning from GWI to VISPO. The estimates, which include time and money for training VISPO employees, range from $600,000 to $1.9 million. (Tr. 124:1–126:16, July 29, 2025.)

The District has failed to pay invoices provided to them by GWI for the months of February, March, and April. There is an ongoing conversation with the District about paying for those invoices. (Tr. 140:21–23, July 29, 2025.)

## *Conclusions of Law*

The District seeks a preliminary injunction. In its original motion, it requested an order requiring GWI to comply with the Transition Policy, to provide access to the communications plant and all components, and to cease further efforts to frustrate the transition to VISPO. In a subsequent filing, the District proposed a detailed order with twenty-three specific requests. GWI opposes these requests, arguing the Operating Agreement does not permit the District to require it to incur costs by training competitors to take over their business and revealing confidential business matters. They further assert the District's more detailed proposed order seeks to terminate their operating agreement prior to December 31, 2025.

### I.   *Legal Standard*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666-67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "Its purpose 'is merely to preserve the relative positions of the parties until

5

a trial on the merits can be held.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A party seeking a preliminary injunction must generally establish a likelihood of success on the merits, a likelihood of irreparable harm if preliminary relief is not granted, that the balance of [hardships] tips in the [movant]'s favor, and that an injunction is in the public interest. *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (citing *JTH Tax*, 62 F.4th at 667).

Under certain circumstances, the "likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff 'show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm.'" *Daileader*, 96 F.4th at 356 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). One such situation is where "an injunction will alter, rather than maintain, the status quo." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). This is known as a mandatory injunction. *JTH Tax*, 62 F.4th at 667. "The [s]tatus quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (alteration in original) (internal quotation marks and citation omitted). In acting to preserve the status quo "a court may require the parties to act or to refrain from acting." *LaRouche v. Kezer*, 20 F.3d 68, 74 (2d Cir. 1994).

As an initial matter, the parties dispute whether the District seeks a prohibitory injunction or a mandatory injunction. The facts here exemplify the difficulties in distinguishing between the two. The District asserts the injunctive relief it seeks requires GWI to perform its obligations under the Operating Agreement and, therefore, does not require a heightened standard of proof. GWI counters imposition of the Transition Policy requires it to engage in "significant new work without compensation" and constitutes a requested mandatory injunction. (Doc. 31 at 10.)

6

The challenge in identifying the type of injunction is not novel.

> Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of "status quo." A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.

*Tom Doherty Associates, Inc.*, 60 F.3d at 34.

The Second Circuit has outlined another consideration in determining whether a heightened standard of proof is required. *Id.* at 34–35.

> A heightened standard can be . . . justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclosure of confidential information. The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief. Otherwise, there is no reason to impose a higher standard.

*Id.* at 35 (citation omitted).

The granting of preliminary relief, in this case, will not render a trial on the merits meaningless. If GWI is successful in its underlying claim or in defending against the District's counterclaims, they will be able to obtain the monetary relief they seek in their initial complaint. While they have argued the District may "misappropriate GWI trade secrets and confidential information," there is insufficient evidence to support that concern. Under the facts presented in this case, the court finds the District need not establish a heightened burden of proof in order to receive preliminary relief.

### A.   Irreparable Harm

For a court to grant "a preliminary injunction, the [movant] must demonstrate that the order is necessary to prevent irreparable harm." *Veale v. United States Dep't of Just.*, No. 1:05-CV-105, 2005 WL 8154703, at *1 (D. Vt. Dec. 27, 2005). A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotation marks and citation omitted). "This requirement must therefore be satisfied before the other requirements for an injunction can be considered." *Id.* (citation omitted).

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). Irreparable harm is an injury "for which a monetary award cannot be adequate compensation." *Tom Doherty Associates, Inc.*, 60 F.3d at 30 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

The District asserts it will suffer irreparable harm if not granted a preliminary injunction, because absent GWI's cooperation and participation in a transition plan, there will be significant disruption in its ability to provide broadband communications service to their customers. GWI counters it is prepared to operate the network until December 31, 2025 and any concern about what might happen on January 1, 2026 does not qualify as "actual and imminent harm." (Doc. 31 at 14.)

Loss of goodwill and potential loss of current and future customers can constitute irreparable harm. *See Tom Doherty Associates Inc.*, 60 F.3d at 37–38; *Indep. Wireless One Corp.*

*v. Town of Charlotte*, 242 F. Supp. 2d 409, 416 (D. Vt. 2003) (noting municipality's denial of permit to install telecommunications antennas, submitted by network provider operator, constituted irreparable harm when no comparable service existed in municipality and expert testimony indicated an increased likelihood of dropped calls and roaming charges among other harms). A company may suffer irreparable harm when it is unable to deliver a unique product to customers who rely on the product. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–08 (2d Cir. 1990) ("[T]erminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor").

The District is a municipal corporation formed to "operate, cause to be operated, or contract for the construction, ownership[], managements, financing, and operation of a communications plant for the delivery of communications services[.]" 30 V.S.A. § 3054(a)(1). The District provides broadband communication services to slightly less than 10,000 customers in thirty-one towns. The District provides this service through ECFiber, which is the internet service provider business owned by the District. The District has decided not to renew its contract with the current operator of ECFiber, GWI, and instead has granted the contract to another operator. The operation of a communications plant to provide communication services to multiple municipalities cannot be transitioned from one operator to another instantaneously. Disruption in the operation of the network would inevitably result if one operator stopped working at 11:59 p.m. on December 31, 2025 and another operator started at 12:00 a.m. on January 1, 2026 without any coordination between the two. If a transition policy is not implemented prior to the end of the current contract, there will be significant disruption in the ability of the District to provide communication services

to its customers. A loss of goodwill and customers, would certainly result if subscribers could not rely on the District's provision of uninterrupted network service.

In its arguments against the preliminary injunction, GWI has repeatedly highlighted that the new operator, VISPO, does not have any employees. In effect, this is an argument that even with a preliminary injunction, the harm may not be avoided as there will not be VISPO employees available and trained on January 1, 2026 to assume responsibility for operating the network. The court agrees that VISPO (and the District) may not have foreseen the issues it might confront in hiring staff. Despite a contrary belief by the District, it is evident that the transition between GWI and VISPO will be unlike the transition from ValleyNet to GWI. The situation is entirely different. This problem, however, is borne by VISPO and the District. The court cannot conclude VISPO will not be sufficiently staffed to operate ECFiber on January 1, 2026. The court can determine, however, the provision of services to the District's customers will be disrupted if GWI does not participate in a transition process. The District has established the likelihood of irreparable harm without injunctive relief.

**B.   *Likelihood of Success on the Merits***

Having found a risk of irreparable harm, the District must now demonstrate a likelihood of success on their claims against GWI. The District filed a breach of contract claim against GWI, alleging GWI breached the contract when it failed to abide by the Transition Policy adopted by the District's Governing Board on May 13, 2025. The central issue in this litigation is whether the Operating Agreement governing the relationship between the District and GWI allows the District to adopt a Transition Policy that GWI is required to follow and whether there are limits as to what the District can require of GWI. This question hinges on the terms of the Operating Agreement.

10

Under Vermont law, "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (1981); *see Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008). "To determine whether a contract 'fairly admits of but one interpretation,' the 'agreement must be viewed in its entirety, with an eye toward giving effect to all material parts in order to form a harmonious whole.'" *Constr. Drilling, Inc. v. Eng'rs Constr., Inc.*, 2020 VT 38, ¶ 14, 212 Vt. 323, 236 A.3d 193, 199 (2020) (citing *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 580, 556 A.2d 81, 85 (1988)).

"'If the court concludes the writing is unambiguous, it must declare the interpretation as a matter of law'; if it reaches the opposite conclusion, interpretation of the ambiguous contract becomes a question of fact." *Constr. Drilling, Inc.*, 2020 VT at ¶ 12, 212 Vt. at 323, 236 A.3d at 198 (citation omitted). "Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen*, 150 Vt. at 579, 556 A.2d at 84.

When assessing whether a contractual term is ambiguous, a court should "consider the circumstances surrounding the making of the agreement." *Id.* "[T]he fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." *Id.* at 581, 556 A.2d at 85. In viewing the contract "in its entirety, with an eye to harmonizing each of its material parts" the court must first identify "those portions germane to this dispute." *Constr. Drilling*, 2020 VT at ¶ 15, 212 Vt. at 323, 236 A.3d at 199.

There are several sections in the Operating Agreement germane to this dispute. The introduction to the agreement provides that the District is contracting with GWI "to design, construct and operate one or more communications plants (the "Project") for the delivery of

11

District's broadband communications services to commercial, residential, governmental and educational subscribers with the State of Vermont[.]" (Ex. A at 1.) Section 1 of the Operating Agreement states:

> [t]he parties acknowledge that the benefits of this Agreement shall devolve upon District and its members municipalities, and shall be disposed of by the District pursuant to enactments under which it is established. The parties further acknowledge that *the District*, acting through its Governing Board as the legislative body of a municipal corporation, *is responsible for establishing and articulating policies to be acted upon and implemented by [GWI] under this Agreement.*

(*Id.*) (emphasis added).

Section 2 clearly identifies the ending date of the Agreement under which GWI has both the rights and obligations to "design, construct and operate" the Project for the delivery of broadband communications services. GWI enjoys these rights and obligations until December 31, 2025. (*Id.*)

Section 6 of the Operating Agreement provides:

> [GWI] will, on behalf and for the benefit of District, implement fully the design, construction, operation and management of the Project and broadband communications services systems as may be approved from time to time by the Governing Board of the District, and any related operating and management agreements as agreed upon in writing by the parties that may be subsequently developed and deemed useful and necessary for the successful operation of such communications plants and the delivery of broadband communications services.

(*Id.* at 2.)

Importantly, Section 6 provides that GWI will "implement fully the . . . operation" of the broadband and communications services system as approved by the District. (*Id.*) This section requires GWI to "implement fully" any additional related operating and management agreements. The terms of this section do not limit the District's ability to establish the "design, construction, operation and management" of the Project which GWI must then fully implement. Section 6 also

12

imposes an obligation on GWI to "communicate at least monthly with the District Governing Board . . . as to the operational and financial condition of the Project." (*Id.*)

The next relevant portion of the Operating Agreement is Section 10. (*Id.* at 3.) This provision requires the District and GWI to "comply with the General Operating Policies and Protocol ("Operating Protocol"), which is attached hereto as Exhibit A and has been designed to ensure clear and continuous communications among the parties and related third parties. *This Operating Protocol may be modified from time to time by mutual written consent of District and [GWI].*" (*Id.*) (emphasis added.) The Operating Protocol, however, contains the following clause:

> The operating policies and protocols articulated herein are intended to conform to and supplement the enactments and agreements establishing the District and its delivery of communications services under the auspices of [GWI]. *Such policies will be established and modified from time to time by the District's Governing Board.*"

(*Id.* at 7.) (emphasis added).

The parties differ as to how the provision in Section 10 of the Operating Agreement and the terms of the Operating Protocol should be read. The court must read the contract in its entirety, attempting to give effect to all material parts to form a harmonious whole. *See Constr. Drilling*, 2020 VT at ¶ 15, 212 Vt. at 323, 236 A.3d at 199. Under Section 10, GWI and the District must agree before the Operating Protocol may be modified, but the Operating Protocol itself gives the District, through its Governing Board, the ability to establish the policies contained in the Operating Protocol *and* to modify the same policies.

There is a limit, however, to the District's ability to modify the policies contained in the Operating Procotol. The policies must "conform . . .and supplement the enactments and agreements establishing the District and its delivery" of services by GWI. (Ex. A at 7.) For example, any policy which would, in effect, terminate GWI's ability to "operate" the Project "for

13

the delivery of District's broadband communications services" prior to December 31, 2025 would be outside the scope of the District's ability to modify the policies contained in the Operating Protocol, as it would not "conform . . . and supplement" the agreement between the parties. Similarly, any policy which, in effect, required GWI employees to "report to or be under the supervision of any District official" would not be permitted under the Operating Protocol, as that would not "conform . . . and supplement" Section 20(e) of the Operating Agreement.

On the other hand, the District's ability to prevent GWI from entering into a contract with a third-party, where that contract is greater than $50,000 in one year, is entirely within the terms of the Operating Agreement. (*Id.* at 3.) The Operating Protocol provides further clarification as it relates to contracts under $50,000 within any one year, providing that GWI can sign those "without prior approval, *pursuant to formal District authorization.*" (*Id.* at 9.) (emphasis added). Despite GWI's argument, there is nothing in the Operating Agreement or the Operating Protocol that limits this to a *net* expenditure. The contractual provision refers to "third-party contract[s] greater than $50,000 in any one year." (*Id.* at 3.) While GWI may have sound reasons for its belief that the Gaiia operating system may be better than Vision, the Agreement does not authorize GWI to override the decision of the District as it relates to such contracts. Additionally, the District can also insist that GWI "communicate at least monthly with the District Governing Board and/or the Executive Committee . . . as to the operational and financial condition of the Project." (*Id.* at 2.) This is further clarified in the Operating Protocol, which provides the District's Governing Board will meet at least quarterly *or as needed*, and "[a]t all meetings of the District Governing Board, [GWI] will report on the operational, financial and construction status of the Network Project." (*Id.* at 8.)

Reading Section 10 of the Operating Agreement and the Operating Protocol in conjunction with each other in this manner supports an overarching premise of the Operating Agreement. Section 1 of the Operating Agreement provides that "the District, acting through its Governing Board as the legislative body of a municipal corporation, is responsible for establishing and articulating policies to be acted upon and implemented by [GWI] under this Agreement." (*Id.* at 1.)

The court concludes the District is empowered under the Operating Agreement to adopt a transition policy, so long as that policy "conform[s] . . . and supplement[s]" the rights and obligations of the parties outlined in the Operating Agreement. For this reason, the court finds the District has demonstrated a likelihood of success on the merits of its breach of contract claim. While there are aspects of the District's Transition Policy that do not "conform . . . and supplement" these rights and obligations, this does not negate the District's ability to implement such a policy. Accordingly, the District has demonstrated a likelihood of success on the merits on its breach of contract claim.

### C.  *Balance of Hardships and Public Interest*

The court must also weigh the harm experienced by the District if a preliminary injunction is not imposed against the harm to GWI if injunctive relief is granted. The harm experienced by the District in the absence of a preliminary injunction is outlined above. The court does not find a burden to GWI that outweighs that harm. The Operating Agreement between the District and GWI is clear. The District "shall pay all costs of constructing, operating and managing the Project and broadband communications services[.]" (*Id.*) The Operating Agreement further provides that GWI "shall receive upon invoice to District its actual and direct expenses incurred in furnishing the broadband communications services and support contemplated herein." (*Id.*) GWI shall also

receive compensation of $10.00 per service subscriber per year. (*Id.*) In sum, any cost incurred by GWI to comply with the preliminary injunction will be paid by the District.

Finally, the court notes that public interest weighs strongly in favor of a preliminary injunction. Absent a coordinated transition from GWI to VISPO, the broadband communication network in the rural areas of Vermont provided by the District will experience significant disruption. Given the amount of work, telephone calls, and services that require internet access, interruptions in service for close to 10,000 Vermonters would be devastating. For all of these reasons, the court finds a preliminary injunction is appropriate.

### D.  *Security*

Federal Rule of Civil Procedure 65 provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). GWI asserts that a $ 1.5 million bond is appropriate based on the estimate it received from a consultant as to the cost associated with the transition. The District counters that all costs incurred by GWI in complying with the transition will be paid by the District and GWI will not suffer any additional expense.

The court agrees with the District. The District has been explicit in its pleadings as well as at the hearing that any expenses created by compliance with the preliminary injunction will be paid by the District. As a result, the court determines that even if GWI is found to have been wrongfully enjoined, it will not suffer additional cost. Accordingly, no security will be required.

### II.  *Terms of the Preliminary Injunction*

In its initial motion, the District sought a preliminary injunction which required GWI to comply with the Transition Policy adopted by the Governing Board on May 12, 2025. In a

subsequent filing, the District included a draft order which included twenty-three discrete requests. In determining the appropriate conditions of the preliminary injunction, the court will first look to the Transition Policy, as this was the policy adopted by the District's Governing Board. The first substantive section of the Transition Policy provides that all property used in ECFiber's business is the property of the District. (Ex. Q at 1.) There does not appear to be a significant dispute that the property of the District will remain with or be returned to the District on December 31, 2025.

The latter part of the section, however, provides that "the new operator's employees should be executing the billing functions a month or more in advance of the end date of this agreement." (*Id.*) This appears to impinge upon GWI's right and obligation to "operate" the communications plants and broadband communications services through December 31, 2025. (Ex. A at 1.) The Operating Protocol provides that GWI will "[e]xecute and complete the Network Project including designing, building all associated Network assets and operating them as an ongoing business." (*Id.* at 8.) GWI has the right and obligation to do this under the parties' agreement. To accomplish this, GWI has the right and obligation to have staff available to "execute" the Project. (*Id.* at 9.) The District's effort to relieve GWI of that obligation prior to December 31, 2025 is contrary to the terms of the Operating Agreement. Requiring GWI to turn over operational control of the Network to another entity prior to the end of the agreement would constitute an early termination of the agreement.

The next two sections of the Transition Policy seeks to ensure "all vendor, regulatory, banking, subscriptions and other contractual service arrangements" are not modified, altered or terminated through the end of the year. The only contract that appears to be in dispute is the contract with Vision. As stated above, regardless of GWI's good faith belief in the value of

17

changing to Gaiia, this contract is sufficiently large so as to require District approval, and the District has decided to remain with Vision.

Finally, and by agreement of the District, GWI will not be responsible for training VISPO employees. GWI, however, cannot restrict access to the building, records, or systems used in the operation of the District's business by members of the District or others authorized by the District to have such access.

It is hereby ORDERED:

1. GWI and GWI VT shall not impose any manner of changes to the District's systems, procedures, data, or configuration of the District's communications plant, effective as of July 29, 2025, except as necessary and consistent with GWI and GWI VT's contractual obligations under the Operating Agreement to deliver telecommunications services to network subscribers. GWI and GWI VT shall maintain the District's systems, procedures, data, and configuration of the District's communication plants in the same manner as those procedures, data, and configurations in use on July 29, 2025, without taking, modifying, resetting, disposing, selling, transferring, abandoning, or discontinuing until December 31, 2025.

2. GWI and GWI VT shall not cancel, modify, transfer, or in any other manner cause third-party contractual service arrangements including contracts with vendors, subscriptions, software licenses, regulatory permissions and licenses, banking service agreements, for the operation of the District's communications plant to be interrupted.

3. GWI and GWI VT shall make no changes to the District's customer management systems, billing and payment systems, customer service systems, and other related business systems as they were in use on July 29, 2025.

4. GWI and GWI VT shall not exclude personnel of the District from access to the District's communications plants, nor prohibit any personnel expressly authorized by the District in writing from access to the District's communications plants.

5. GWI and GWI VT shall not prevent personnel of the District from monitoring GWI and GWI VT's work affecting the District's communications plants, nor prohibit any personnel expressly authorized by the District in writing from monitoring GWI and GWI VT's work affecting the District's communications plants.

6. GWI and GWI VT shall not be compelled to share confidential business information with the District or a District representative.

7. GWI and GWI VT shall immediately grant the District full access to all bookkeeping and accounts payable operations related to ECFiber. The District shall have no obligation to disclose information related to business other than that associated with ECFiber. To the extent the information needs to be separated, GWI and GWI VT shall complete that process in as expeditious a manner as possible. All reasonable work undertaken to provide the District access in this manner shall be paid for by the District.

8. GWI and GWI VT shall by no later than September 3, 2025 grant the District full access to all billing, customer service, network management, outside plant and marketing operations related to ECFiber. All reasonable work undertaken to provide the District access in this manner shall be paid for by the District.

9. GWI and GWI VT is not required to train VISPO employees.

10. This Order shall not be construed to relieve the District of any obligations imposed under the Operating Agreement to make payments owed to GWI or GWI VT for actual

costs incurred in the operation of the District's communications plant through December 31, 2025.

11. The District is ordered to continue to pay to GWI and GWI VT any sums due pursuant to the Operating Agreement during the duration of the Operating Agreement.

12. GWI and GWI VT shall continue to provide information to the District as required by the Operating Agreement and Operating Protocol, including at all meetings of the Governing Board.

DATED at Rutland, Vermont, this 11th day of August 2025.

_____
Mary Kay Lanthier
United States District Court Judge